IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>LIANE ELLSWORTH,<br><br>　　　　　Defendant. | 8:18CR88<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on the Motion to Suppress Evidence (Filing No. 17) filed by Defendant, Liane Ellsworth. Defendant filed a brief (Filing No. 18) in support of the motion and the government filed a brief (Filing No. 23) in opposition.

The Court held an evidentiary hearing on the motion on June 27, 2018. Defendant was present with her attorney, Mary Gryva. The government was represented by Assistant United States Attorney, Patrick McGee. Douglas County Deputy Sheriff Eric Olson ("Deputy Olson") testified on behalf of the government. A copy of Deputy Olson's cruiser audio-video recording of the traffic stop was offered by the government as Exhibit 1[1] and received by the Court without objection. (TR. 12:22-13:2). A transcript (TR.) of the hearing was prepared and filed on July 6, 2018. (Filing No. 29). The matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that the motion be denied.

## BACKGROUND

On March 7, 2018, Deputy Olson[2] initiated a traffic stop of a Chrysler 300 vehicle for following another vehicle too closely while travelling eastbound on Interstate 80 in Omaha. (TR. 11:10-25).[3] Deputy Olson ran the Chrysler's plates and determined it was a rental vehicle. (TR.

---

[1] The recording is comprised of five separate audio-visual "clips." The Court will refer to a specific clip as "Clip 1," "Clip 2," etc.

[2] Deputy Olson has been employed by the Douglas County Sheriff's Department since December 2004, the last six years of which he has been a K-9 criminal interdiction officer, which involves looking for and intercepting the "travelling felon." Deputy Olson primarily conducts criminal interdiction on I-80, Amtrak and bus stations, and postal and package delivery facilities, as well as providing canine assistance upon request. He testified to his extensive and ongoing criminal interdiction training and experience. (TR. 8:17-10:1).

[3] Clip 1 and Clip 2 of Exhibit 1 depict Deputy Olson observing the Chrysler "on the verge of following too close." (Ex. 1, clip 1 at 21:12; clip 2 at 23:15). Clip 3 depicts the actual traffic stop.

15).  When Deputy Olson approached the vehicle, he observed numerous food and drink containers, blankets and pillows, clothing items, and an air freshener hanging from the rear-view mirror.  (TR. 14:16-20; 15:5-7).

Deputy Olson made contact with the occupants of the vehicle from the passenger side.  (Ex. 1, clip 3 at 27:29).  Michael Snyder was the driver and Defendant was the passenger.  (TR. 12:11-24; 16:21-24).  Deputy Olson informed Snyder he needed to pass sooner and requested Snyder's driver's license, vehicle information, and rental agreement.  (Ex. 1, clip 3 at 27:28-40; TR. 15:20-16:24).  Snyder provided Deputy Olson with a Washington operator's license but did not produce the rental agreement.  (TR. 15:20-16:8).  Snyder stated that he could not rent a vehicle in Indiana because he was not a resident of Indiana or a surrounding state, so his brother had rented the vehicle for him.  (TR. 16:23-17:5; 18:1-9).  Deputy Olson asked Snyder to come back to Deputy Olson's cruiser and left Defendant in the Chrysler.  (Ex. 1, clip 3 at 28:10-13; TR. 18).

Deputy Olson began to ask Snyder about his travel itinerary.[4]  Snyder told Deputy Olson that he and Defendant, who is his girlfriend, were travelling from California where they had been for about a week and went to a Six Flags amusement park.  Snyder stated that he is medically retired and lives in Washington, and that he was considering moving back to Indiana where Defendant lives because he was going through a divorce.  Deputy Olson asked Defendant how he got to Indiana and he said he "traveled" (then clarified he flew).  Snyder denied having ever been arrested.  (Ex. 1, clip 3 at 28:51-30:00).

Deputy Olson returned to the Chrysler to talk to Defendant.  Defendant told Deputy Olson that she and Snyder were coming from California where they had been for a "couple days," having left on Thursday or Friday for "two nights, three days," and had stayed with her uncle.  When asked where Snyder lives, Defendant stated that Snyder is from Washington but had been "staying" in South Bend, Indiana with his brother.  (*Id.* at 30:19-31:58; 32:21-30).  When Deputy Olson asked Defendant how Snyder got to Indiana, Defendant said that Snyder has a car.  (*Id.* at 31:59-32:20).

Deputy Olson returned to his cruiser and asked Snyder more questions about their trip. Snyder stated they stayed in California for three or four days, having left on Thursday (March 1)

---

[4] The undersigned notes that Deputy Olson's testimony and recollection of details and events were not entirely consistent with the audio-video recording of the encounter as reflected in Exhibit 1.  While these inconsistencies do not ultimately change the outcome in this case, the details of the traffic stop set forth herein primarily come from the undersigned's review of Exhibit 1, rather than Deputy Olson's testimony.

or Friday (March 2), and stayed with Defendant's uncle. (*Id.* at 32:48-33:19, 34:19-27). When Deputy Olson asked Snyder why they did not stay in California longer, Snyder said they only had the rental car for one week. (*Id.* at 34:29-42). Snyder denied having anything illegal in the vehicle, including narcotics, and stated they were traveling with only one duffel bag. Snyder also stated he and the Defendant had only been dating for about a week and a half to two weeks. (*Id.* at 34:48-35:31). At this point, Deputy Olson contacted the El Paso Intelligence Center, or "EPIC" to begin the record check of the Defendant and Snyder. (*Id.* at 35:56; TR. 21).

While the record check was being completed, a back-up officer, Deputy Woodward, arrived at the scene and began speaking with Defendant. (Ex. 1, clip 3 at 42:09; TR. 25). Deputy Olson received the results of the criminal history, noted it was "all good," and began asking Snyder about the details of the rental vehicle dates. Snyder stated they had the rental vehicle from the 1st through the 7th, took two days to drive to California, and that they rented a hotel room for three days, although earlier both Snyder and Defendant stated they had stayed with Defendant's uncle. (Ex. 1, clip 3 at 42:40-43:31).

Deputy Olson returned to the Chrysler to speak to Defendant. Defendant again stated that they stayed with her uncle in California, but then changed her account when Deputy Olson told her that Snyder said they stayed at a hotel. (*Id.* at 43:47-50-44:00). Defendant confirmed that they shared one duffle bag, denied having anything illegal, and consented to a search of her property if Snyder agreed to a search of the Chrysler. (Ex. 1, clip 3 at 44:04-30; TR. 25:17-27:6). Deputy Olson returned to his cruiser and consulted with his back-up officer, Deputy Woodward, who commented on Defendant's nervousness. (Ex. 1, clip 3 at 44:42-50; TR. 27:7-12).

Deputy Olson returned to his cruiser, told Snyder that he would be given a verbal warning, and explained the two car-length rule. (Ex. 1, clip 3 at 45:02-40; TR. 27:13-19). Deputy Olson then asked Snyder if he would answer some other questions, and Snyder replied "yeah, sure." (Ex. 1, clip 3 at 45:46-50). Deputy Olson asked Snyder about the discrepancy in stories regarding where they stayed in California, and Snyder explained that they visited Defendant's uncle and that Defendant must have been confused. (*Id.* at 45:50-46:03). Snyder denied having anything illegal in the vehicle, including cocaine, methamphetamine, heroin, or marijuana. (*Id.* at 46:03-12). Deputy Olson testified that Snyder paused before denying having methamphetamine.[5] (TR. 28:2-

---

[5] However, the pause is only somewhat noticeable to the undersigned after review of the audio-visual recording. (Ex. 1, clip 3 at 46:10-12).

3

7). Deputy Olson requested Snyder's consent to search the Chrysler, which Snyder denied. (Ex. 1, clip 3 at 46:16-20). Deputy Olson stated that he was going to walk his narcotics dog around the vehicle, and Snyder stated, "ok." (*Id.* at 46:20-23). Deputy Woodward returned to the Chrysler where Defendant volunteered that officers "could search [her] purse if [they] want." (*Id.* at 47:11-15).

After Defendant was placed in Deputy Woodward's cruiser, Deputy Olson deployed his canine, which alerted and indicated to the odor of narcotics emanating from within the Chrysler. (TR. 29:14-25). Deputy Olson conducted a search of the Chrysler starting with the trunk and the duffle bag. Officers observed an M&M box adjacent to the duffle bag that appeared to have been opened and resealed with new glue. Officers searched the M&M box and found three large zip-lock baggies containing approximately three pounds of methamphetamine.[6] (TR. 29-30).

Defendant has filed the instant motion to suppress all evidence obtained from the traffic stop of the Chrysler, arguing that the initial stop was unsupported by probable cause and that her subsequent detention was prolonged without reasonable suspicion. (Filing No. 17; Filing No. 18).

## ANALYSIS

Initially, the undersigned recognizes that, "Generally, a mere passenger does not have standing to challenge a vehicle search where he has 'neither a property nor a possessory interest in the automobile.'" *United States v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015)(quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 148 (1978)). And indeed, Defendant does not assert that her personal Fourth Amendment Rights were violated by the search of the Chrysler or M&M package itself.[7] Instead, Defendant argues that the stop and her detention were unlawful, which she does have standing to challenge, see *Brendlin v. California*, 551 U.S. 249, 259 (2007), and therefore the

---

[6] The government's brief asserts that in separate post-*Miranda* interviews, Snyder denied knowledge of the methamphetamine and Defendant admitted it was hers (and also produced a personal amount of methamphetamine, a scale, and a needle). (Filing No. 23 at p. 4). No evidence was adduced as to such statements or evidence, which are only considered for purposes of determining what matters Defendant seeks to suppress in the instant motion. (TR. 3:20-5:18).

[7] Although non-owners of a vehicle may have a subjective expectation of privacy in it and in its containers, Defendant did not argue or demonstrate she had any legitimate expectation of privacy in the M&M container, which is where officers found the evidence that is the subject of this motion. See, e.g., *United States v. Edwards*, 632 F.3d 633, 642 (10th Cir. 2001).

4

subsequent dog sniff of the vehicle and evidence obtained as a result of the search were the fruit of the unlawful stop and detention.

### A.     Stop of the Vehicle

Defendant asserts that the initial stop of the Chrysler violated her Fourth Amendment rights; specifically, that it was a pretextual stop for which the primary purpose was drug interdiction. (Filing No. 18 at p. 4; TR. 41-42). Deputy Olson was clearly engaged in criminal interdiction when he initiated the traffic stop of the Chrysler. (TR. 31). Nonetheless, "[I]f police observe a traffic violation, no matter how minor, there is probable cause to stop the vehicle." *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016)(citing *United States v. Mendoza*, 677 F.3d 822, 827 (8th Cir. 2012)). "This is true even if a valid traffic stop is a pretext for other investigation." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007)(internal quotations omitted). "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *Fuehrer*, 844 F.3d at 772 (quoting *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011)).

Nebraska law provides that a driver "shall not follow another vehicle more closely than is reasonable and prudent[.]" Neb. Rev. Stat. § 60-6,140(1). Deputy Olson is an experienced law enforcement officer making approximately 100 traffic stops per month. (TR. 10-11). Deputy Olson testified that he observed the Chrysler following another vehicle at a distance of one to one-and-a-half car lengths, which he testified in his training and experience is too close for vehicles traveling at highway speeds of 50 to 60 miles per hour. (TR. 11). The audio-video recording from Deputy Olson's cruiser supports his testimony. (Ex. 1, clip 3). Under the facts presented, Deputy Olson had probable cause to stop the Chrysler for following too close, in violation of Nebraska law. See, e.g., *State v. Draganescu*, 755 N.W.2d 57, 74 (Neb. 2008)(finding officer had probable cause to stop a vehicle traveling one car length behind another while traveling 70 mph using an objective standard of one car length for every 10 mph of speed); *United States v. $38,000.00 in U.S. Currency*, No. 8:12CV35, 2013 WL 2368377, at *3 (D. Neb. May 29, 2013)(finding sufficient basis for a stop for following too close where trained and experienced law enforcement officer observed a vehicle traveling at 60 mph at a distance of one car length behind another).

### B. Detention

Defendant next argues her detention after the traffic stop was unlawfully prolonged, without reasonable suspicion, in violation of *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

"After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016)(quoting *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013). These tasks may involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S. Ct. at 1615. "An officer also may request that the driver sit in the patrol car to answer questions and may ask questions about his itinerary." *Englehart*, 811 F.3d at 1040 (quoting *Quintero-Felix*, 714 F.3d at 567). "At a minimum, a reasonable investigation can include 'asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012)(quoting *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005)). Once the initial investigation and the purpose of the stop are complete, further detention is unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007)(quoting *United States v. Jones*, 269 F.3d 919, 925 (8th Cir. 2001)).

As discussed above, Deputy Olson initiated a valid traffic stop of the Chrysler for the traffic violation of following too closely. Deputy Olson was therefore permitted to ask Snyder to sit in his police cruiser (and thus detain Snyder and Defendant) while he completed the routine tasks associated with the "mission" of issuing a warning for that traffic violation and to attend to safety concerns. See *Rodriguez*, 135 S. Ct. at 1615. Deputy Olson was also permitted to inquire about Defendant and Snyder's destination, route, and purpose. See *Mendoza*, 677 F.3d at 828. However, Defendant argues that Deputy Olson's drug interdiction investigation unreasonably prolonged her detention for the traffic violation, without reasonable suspicion. See *Rodriguez*, 135 S. Ct. at 1614 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)("A seizure that is

6

justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

Review of Exhibit 1 makes it clear that Deputy Olson engaged in early and persistent interdiction tactics throughout the encounter. The Eighth Circuit has, in dicta, indicated that a Fourth Amendment violation may occur when an officer's "'blended process' of conducting a drug interdiction investigation unreasonably prolong[s] a run-of-the-mill traffic stop." *United States v. Riley*, 684 F.3d 758, 765 (8th Cir. 2012)(discussing *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008)); *United States v. Murillo-Salgado*, 854 F.3d 407, 419-20 (8th Cir.)(Kelly, J., dissenting), *cert. denied*, 138 S. Ct. 245 (2017). In this case, by asking off-topic questions in a back and forth manner between Snyder and Defendant, Deputy Olson measurably extended the stop. Nonetheless, the undersigned concludes that Deputy Olson had reasonable suspicion justifying the "blended" questioning and the resulting extension of the stop.

Upon contacting the occupants of the vehicle, Deputy Olson noticed an air freshener hanging from the rear-view mirror of a rental vehicle and noticed that the vehicle had a "lived-in" look, both of which are significant to Deputy Olson in his training and experience in narcotics trafficking investigations. See, e.g., *United States v. Foley*, 206 F.3d 802, 804 (8th Cir. 2000)(considering it suspicious to have an air freshener in a rented vehicle); *United States v. Anguiano*, 795 F.3d 873, 877 (8th Cir. 2015)(considering a vehicle's "lived-in" appearance as one factor in combination with others supporting reasonable suspicion). Additionally, Snyder was unable to produce the vehicle's rental agreement, which Deputy Olson testified is common in narcotics trafficking, particularly when stopping individuals who are "just mules" told to pick up a car and "drive from point A to point B." (TR. 16). Moreover, Deputy Olson testified that Snyder's explanation that he could not rent a vehicle in Indiana because he had a Washington driver's license did not make sense. (TR. 18). The above factors gave rise to reasonable suspicion justifying Deputy Olson's broadening of his investigation. See *United States v. Ward*, 484 F.3d 1059, 1061 (8th Cir. 2007)("If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions.").

Deputy Olson's subsequently broadened investigation revealed several additional items supporting reasonable suspicion that criminal activity was afoot: discrepancies between the stories of Snyder and Defendant as to the duration of their stay and where they stayed; Defendant and

Snyder's nervousness; the fact that Snyder and Defendant had been dating for a very short period of time; the short length of their stay in California considering the required time and cost of travel there by rental vehicle; not knowing precisely when they began their trip; the fact that they shared one duffle bag for a week-long trip; and Deputy Olson's perception of Snyder's pause before answering the question about the presence of methamphetamine.

Defendant argues that these factors, individually and in combination, fail to meet the reasonable suspicion threshold because they describe a very broad category of predominantly innocent travelers. See e.g. *United States v. Beck*, 140 F.3d 1129, 1139 (8th Cir. 1998). However, while some of the factors may reasonably be determined to have innocent explanation, the court must avoid engaging in a "divide-and-conquer analysis." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The court gives law enforcement officers "substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). This is because "the police possess specialized law enforcement experience and thus may 'draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous.'" *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005). Accordingly, "[w]hether [the officers'] suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012). Based on the above information and totality of the circumstances, the undersigned concludes that Deputy Olson had reasonable suspicion to extend the duration and scope of the traffic stop to conduct a reasonable investigation, which investigation included the canine sniff of the Chrysler. See *Rodriguez*, 135 S. Ct. at 1614-15 (holding police may extend an otherwise-completed traffic stop in order to conduct a canine sniff if the officer has reasonable suspicion); *Quintero-Felix*, 714 F.3d at 567 (holding the existence of reasonable suspicion allows an officer to extend the duration and scope of a traffic stop).

In sum, Deputy Olson had probable cause to initiate the traffic stop and did not unreasonably extend the length of the stop while performing routine tasks. Deputy Olson had reasonable suspicion to extend the traffic stop to conduct the canine sniff. The indication and alert provided Deputy Olson with probable cause to believe narcotics were present. See *United States v. Tuton*, 893 F.3d 562, 570 (8th Cir. 2018)("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to

believe that there are drugs present."). Deputy Olson therefore had probable cause to conduct a warrantless search of the Chrysler and containers within it that could contain narcotics.

Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter, Jr., that Defendant's Motion to Suppress Evidence (Filing No. 17) be denied.

Dated this 25th day of July, 2018.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

### ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.